970 F.2d 552
 61 USLW 2093, 22 Fed.R.Serv.3d 1314,
23 U.S.P.Q.2d 1377
 REEBOK INTERNATIONAL, LTD. (a Massachusetts Corporation) and
Reebok International Limited (a Limited Company of
the United Kingdom), Plaintiffs-Appellees,
v.
MARNATECH ENTERPRISES, INC., Conatech, S.A. de C.V., Nathan
Betech, Various John Does, Jane Does and ABC
Companies, Defendants-Appellants.
 No. 90-55400.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1991.
Decided July 2, 1992.
 
 Neil A. Smith, Limbach & Limbach, San Francisco, Cal., Harley I. Lewin, and G. Roxanne Elings, Lewin & Laytin, New York City, for plaintiffs-appellees.
 Robert G. Dyer, Law Offices of Robert G. Dyer, San Diego, Cal., for defendants-appellants.
 Before: REINHARDT and FERNANDEZ, Circuit Judges, and SMITH, District Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 Appellees ("Reebok") manufacture and sell a fashionable brand of shoes both in America and abroad. They also are the owners of federally registered REEBOK, STRIPECHECK design and STARCREST design trademarks for footwear and apparel, and own registrations for these trademarks in Mexico as well. During the time period relevant to this appeal, appellees assert that they were the only authorized sellers of genuine REEBOK footwear in the United States and Mexico.
 
 
 2
 The nature of the appellants' business is a subject of dispute; indeed, it is the subject of this litigation. Reebok alleges that appellants ("Betech") sell counterfeit REEBOK shoes in Mexican border towns (such as Tijuana) and that these sales detract from purchases of legitimate REEBOK merchandise in both Mexico and the United States. Reebok was sufficiently convinced that such nefarious activity was afoot to move ex parte on September 12, 1989 for a temporary restraining order and a seizure of Betech's assets. The district court apparently agreed: it granted Reebok's motion and ordered Betech to show cause why it should not enter a preliminary injunction along the lines of the ex parte order previously entered. After briefing and argument by both parties, the district court entered preliminary injunctions that ordered Betech and its agents to cease counterfeiting activity, to refrain from destroying particular documents and property, and to transfer certain assets only after court approval. See Reebok International Ltd. v. Marnatech Enterprises, Inc., 737 F.Supp. 1515 (S.D.Cal.1989) (enjoining copyright violations) ["Reebok I "]; Reebok International Ltd. v. Marnatech Enterprises, Inc., 737 F.Supp. 1521 (S.D.Cal.1989) (freezing assets) ["Reebok II "]. Betech appeals, and asserts that the district court had neither the jurisdiction nor authority to enter the injunctions. We affirm.
 
 I.
 
 3
 Appellants first contend that the district court did not have the authority to enter either injunction because the Lanham Act, 15 U.S.C. § 1051 et seq., does not grant jurisdiction over appellants' activities. "The existence of subject matter jurisdiction presents a question of law reviewed de novo by the court of appeals.... A district court's factual findings on jurisdictional issues must be accepted unless they are clearly erroneous." Kruso v. International Telephone & Telegraph Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990) (citations omitted). As the Supreme Court has noted, the Lanham Act provides a "broad jurisdictional grant". Steele v. Bulova Watch Co., 344 U.S. 280, 286, 73 S.Ct. 252, 255, 97 L.Ed. 319 (1952); see also Ocean Garden, Inc. v. Marktrade Co., 953 F.2d 500, 503 (9th Cir.1991) (quoting from Bulova Watch and Reebok I with approval). "The Lanham Act's coverage of foreign activities may be analyzed under the test for extraterritorial application of the federal antitrust laws set forth in Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n, 549 F.2d 597 (9th Cir.1976) (Timberlane I ).... In Timberlane I, we held: first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1395 (9th Cir.1985) (citations omitted); see also Ocean Garden, 953 F.2d at 503 (applying same factors).[1]
 
 
 4
 The first two requirements of Timberlane I are unquestionably met here. " ' "[T]he sales of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction." ' " Ocean Garden, 953 F.2d at 503 (quoting Van Doren Rubber Co. v. Marnatech Enterprises, 1989 WL 223017 * 4, 1989 U.S. LEXIS 17323 * 11, 13 U.S.P.Q.2d (BNA) 1587 (S.D.Cal.1989) (quoting American Rice, Inc. v. Arkansas Rice Growers Cooperative Ass'n, 701 F.2d 408, 415-16 (5th Cir.1983))). The district court found that, at the very least, Betech organized and directed the manufacture of counterfeit REEBOK shoes from the United States and knew that their counterfeit shoes went back to the United States with regular frequency. The district court further found that Betech's sales of counterfeit REEBOK shoes decreased the sale of genuine REEBOK shoes in Mexico and the United States and directly decreased the value of Reebok's consolidated holdings. See Reebok I, 737 F.Supp. at 1517-19. A review of the record indicates that those findings are in no way clearly erroneous. See Kruso, 872 F.2d at 1421. Betech's activities thus affect American foreign commerce in a manner which causes an injury to Reebok cognizable under the Lanham Act. See Ocean Garden, 953 F.2d at 503.
 
 
 5
 The third requirement of Timberlane I--that the interests of and links to American commerce be sufficiently strong in relation to those of other nations to justify extraterritorial application of the Lanham Act--involves the balancing of seven relevant factors:
 
 
 6
 [T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.
 
 
 7
 Timberlane I, 549 F.2d at 614.
 
 
 8
 An analysis of these factors supports the district court's exercise of jurisdiction. The first factor in the Timberlane balancing test involves the degree of conflict with foreign law or policy. Mexico has both civil and criminal trademark laws of its own: extraterritorial trademark enforcement by U.S. courts might, in some instances, conflict with the law or policy of a foreign nation.[2] This possibility is heightened when, as here, one of the parties (Betech) is involved in pending litigation in a foreign court. See Reebok I, 737 F.Supp. at 1517 ("[I]t appears that the Mexican Federal Judicial police arrested defendant, Nathan Betech, and raided defendants' Mexican warehouses and charged those arrested with tax evasion, trademark and copyright counterfeiting and other crimes."). But cf. Timberlane, 549 F.2d at 614 ("Particularly in the field of trade regulation, American laws may not be duplicated by the other nation. That does not necessarily indicate a 'conflict,' however, since non-prohibition does not always mean affirmative approval.").
 
 
 9
 The parties disagree about the precise nature of the Mexican proceedings: Betech asserts that the litigation involved a trademark infringement claim, while Reebok contends that it involved only criminal charges against Betech.[3] Regardless of the exact contours of the litigation in Mexico, it is clear that at the time the district court granted the preliminary injunction, the Mexican litigation presented no conflict with the district court's order because the litigation in Mexico had not yet been concluded. See Reebok I, 737 F.Supp. at 1520 ("This Court's assertion of Lanham Act jurisdiction does not conflict with the law or policy of any nation. Plaintiffs own and control their REEBOK trademark in Mexico. Questions of infringement of the Mexican trademark will be litigated in the Mexican courts."); see also id. at 1517 ("This Court, in granting this Order, does not rely upon, or intend its Order to influence that proceeding, which will be governed solely by and under Mexican law.").[4] Moreover, Mexico and the United States have a common interest in preventing trademark violations and in the protection of any valid Mexican and American trademark registrations owned by Reebok. Although the district court was aware that extraterritorial application of the Lanham Act in this case eventually could result in some degree of conflict with an action of the Mexican courts, the degree of such potential conflict was small. The first of the Timberlane factors therefore may well weigh in favor of the district court's exercise of extraterritorial jurisdiction but at the most, does not weigh strongly against such exercise.[5]
 
 
 10
 The second factor in the Timberlane balance is the nationality or allegiance of the parties and the locations or principal places of business of the involved corporations. One of the Reebok plaintiffs is a Massachusetts corporation and the other is a limited company of the United Kingdom: both have substantial contacts with the United States. Nathan Betech is a Mexican citizen, but he resides in the United States in San Diego, California. Marnatech Enterprises is incorporated in California, and Nathan Betech is the president and owner of Marnatech Enterprises. Nathan Betech and Marnatech Enterprises[6] have offices in San Diego, California: these offices are where the business records of the defendants are kept and are the principal business locations of the defendants. See Reebok I, 737 F.Supp. at 1518. The second factor of the Timberlane test thus weighs in favor of extraterritorial application of the Lanham Act in the present case.
 
 
 11
 The third factor of the Timberlane test--the extent to which enforcement by either state can be expected to achieve compliance--also weighs in Reebok's favor. Because some of Betech's allegedly improper activities occur in Mexico (e.g., the final sale of counterfeit Reebok shoes), it is possible that Mexico could enforce its own or U.S. trademark laws. However, the United States has the superior ability to perform these functions. Each of the defendants, their principal places of business, and the vast majority of their assets are located in the United States. See id. at 1520. Betech's Mexican activities largely occur in towns that border the United States, and the vast majority of its activities are directed towards American commerce and consumers. See id. at 1517-18. The relative ability of the United States to enforce its judgments and orders, as compared to that of Mexico, supports the exercise of extraterritorial jurisdiction. See Ocean Garden, 953 F.2d at 504.
 
 
 12
 The next three factors in the Timberlane test--the relative significance of the effects of Betech's activities on the United States as compared with those elsewhere, the extent to which there is an explicit purpose to harm or effect American commerce, and the foreseeability of such a result--also support the district court's exercise of jurisdiction. Although a portion of its business is conducted in Mexico, Betech's activities are directed towards the United States and have a purposeful, pervasive impact here. See Reebok I at 1517-18. Although Betech's allegedly illegal conduct diverts sales of legitimate REEBOK merchandise in Mexico as well as in the United States, the harm resulting from the possible importation of counterfeit REEBOK shoes from Mexican border towns into San Diego and Los Angeles is considerably greater than the harm caused to Reebok by the possibility that Betech's activities will cause teenagers in Tijuana to forego the purchase of genuine ($100/pair) REEBOK sneakers. Even if Betech did not intend for its allegedly counterfeit shoes to travel the short, well-worn path from Mexican border towns to the United States--a dubious proposition, at best--the foreseeability of that result is undeniable. The fourth, fifth, and sixth factors of the Timberlane test thus provide further support for the exercise of extraterritorial jurisdiction in the present case.
 
 
 13
 The final factor of the Timberlane test--the relative importance to the violations charged of conduct within the United States as compared with conduct abroad--does not clearly support either a decision to exercise extraterritorial jurisdiction or to refrain from doing so. Although the manufacture and distribution of Betech's allegedly counterfeit products was directed from the United States, actual consumer sales of those products may have occurred only in Mexico. Reebok's trademark infringement claim is based both on actions that occurred in the United States as well as in Mexico: it is difficult to say that the actions in either nation were manifestly more significant to Reebok's claim than the actions in the other. In any case, it is irrelevant: the vast majority of the other factors of the Timberlane test clearly weigh in favor of the exercise of extraterritorial jurisdiction and are more than sufficient to outweigh any possible counterbalancing factors which might be found in the present case. In short, this is not a case where "the interests of the United States are too weak and the foreign harmony incentive for restraint too strong to justify an extraterritorial assertion of jurisdiction." Timberlane, 549 F.2d at 609. Because the affirmative requirements of the Timberlane test were met, the district court had jurisdiction over Reebok's claims against Betech.[7]II.
 
 
 14
 Betech asserts that even if the district court had jurisdiction over the Reebok/Betech trademark litigation, it had no authority to enter the preliminary injunction issued in Reebok II that froze Betech's assets.[8] The issue whether district courts have the authority to freeze a defendant's assets in cases arising under the Lanham Act is one of first impression in this circuit.
 
 A.
 
 15
 Rule 65 of the Federal Rules of Civil Procedure governs the procedure for the issuance of a preliminary injunction: the authority for the injunction issued in Reebok II must arise (if at all) elsewhere. See F.T.C. v. H.N. Singer, Inc., 668 F.2d 1107, 1109 (9th Cir.1109). Rule 64 provides one possible source of authority for the district court's asset freeze: it provides that
 
 
 16
 [a]t the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by law of the state in which the district court is held, existing at the time the remedy is sought, subject to the following qualifications: (1) any existing statute of the United States governs to the extent to which it is applicable.... The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated....
 
 
 17
 The district court found that California's attachment statute, Cal.Civ.Proc.Code § 483.010, did not authorize the asset freeze sought by Reebok because its Lanham Act and related state law claims were not " 'based on a contract, express or implied,' " Reebok II, 737 F.Supp. at 1526 (quoting Cal.Civ.Proc.Code § 483.010)), and Reebok does not dispute that ruling.
 
 
 18
 However, the absence of a state law basis for the injunction issued in Reebok II is not necessarily fatal to Reebok's claim that the order was authorized under Rule 64. Although the Rule permits state seizure provisions to be used in federal courts, it also permits seizures authorized by federal law; indeed, it explicitly states that "any existing statute of the United States governs to the extent to which it is applicable." It is thus possible that the Lanham Act itself provides the authority for the injunctions issued by the district court. 15 U.S.C. § 1116(a) provides that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this title." Section 1116 undisputedly authorizes the injunction issued in Reebok I, which enjoined Betech from the continued infringement of Reebok's trademarks. See 15 U.S.C. § 1116(d) (explicitly authorizing the prejudgment seizure of counterfeit goods, the means of making such items, and records of the manufacture, sale, or receipt of counterfeit materials).
 
 
 19
 It is less clear, however, whether or not § 1116 affirmatively authorizes the asset freeze issued in Reebok II. Section 1116(a) permits the issuance of "injunctions, according to the principles of equity" designed "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." Reebok's "rights" under the Lanham Act may include not only the right to be free from the unauthorized dilution of its trademark, but perhaps also the right under 15 U.S.C. § 1117 to recover defendant's profits and damages for that dilution.[9] Although the relief provided by § 1117 is explicitly "subject to the principles of equity," we have held that it is a per se abuse of discretion to fail to award relief under § 1117 that is adequate to make willful trademark infringement unprofitable. See Playboy Enterprises v. Baccarat Clothing Co., 692 F.2d 1272, 1275 (9th Cir.1982). It is possible, therefore, that § 1116(a) might authorize a prejudgment freeze of a defendant's assets if such an action were necessary to protect a plaintiff's right to recovery of § 1117 profits and damages and to ensure that a defendant may not benefit by willfully engaging in illegal trademark activity. Cf. infra at 559, 561 (noting distinction between equitable remedy of accounting for profits and legal remedy of damages).
 
 B.
 
 20
 We need not determine, however, whether Rule 64 or the Lanham Act itself authorizes the prejudgment asset freeze entered in Reebok II because, regardless of the scope of those provisions, the injunction is authorized by the district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief.[10] We have held previously that "[a] court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." Republic of the Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir.1988) (en banc), cert. denied, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). Because "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement," Playboy Enterprises, 692 F.2d at 1275, district courts must implement fully the requirement of 15 U.S.C. § 1117(a) that "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ... subject to the provisions of equity, to recover (1) defendant's profits...." See Playboy Enterprises, 692 F.2d at 1275 (holding that failure to award an accounting of profits is generally a per se abuse of discretion); Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117 (9th Cir.), cert. denied, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968) (noting that an accounting is necessary to prevent unjust enrichment). An accounting of profits under § 1117(a) is not synonymous with an award of monetary damages: "[a]n accounting for profits ... is an equitable remedy subject to the principles of equity." Fuller Brush Products Co. v. Fuller Brush Company, 299 F.2d 772, 777 (7th Cir.), cert. denied, 370 U.S. 923, 82 S.Ct. 1565, 8 L.Ed.2d 503 (1962).
 
 
 21
 Because the Lanham Act authorizes the district court to grant Reebok an accounting of Betech's profits as a form of final equitable relief, the district court had the inherent power to freeze Betech's assets in order to ensure the availability of that final relief. As in Marcos, "[t]he injunction here enjoins the defendants from secreting those assets necessary to preserve the possibility of equitable relief." Marcos, 862 F.2d at 1364. The injunction issued in Reebok II was designed to preserve the possibility of an effective accounting of Betech's profits and the return of profits fraudulently obtained: that objective is permissible and within the power of the district court. See, e.g., id. at 1364 (upholding a prejudgment asset freeze as a means of effectuating the Philippines' equitable right to a return of money placed in a constructive trust because "the Philippines will be entitled to an accounting for, and to impose a constructive trust upon, the property subject to this Order") (emphasis added); Singer, 668 F.2d at 1112-13 (upholding a prejudgment asset freeze in order to secure the equitable right to rescission granted by 15 U.S.C. § 19--again, a remedy similar to the one granted by 15 U.S.C. § 1117); Securities and Exchange Commission v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1105-06 (2nd Cir.1972) (permitting the prejudgment freeze of a defendant's assets in order to obtain restitution of funds fraudulently obtained).
 
 C.
 
 22
 While a court generally has the power "to preserve the status quo by equitable means [and] [a] preliminary injunction is such a means," Marcos, 862 F.2d at 1361, the equitable power to freeze assets does not exist in all cases: it exists only as "ancillary relief necessary to accomplish complete justice." Singer, 668 F.2d at 1113. "Because the authority to issue a preliminary injunction rests upon the authority to give final relief, the authority to freeze assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy." Id. at 1113. Betech relies upon DeBeers Consolidated Mines, LTD. v. United States, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), to support its argument that a freeze of its assets was not "ancillary relief" and hence was beyond the district court's power. The holding of DeBeers is readily distinguished from the present case. DeBeers involved a suit by the United States under the Sherman Act and the Wilson Tariff Act against several corporations involved in the mining of gem and industrial diamonds in Southern Africa. See id. at 215, 65 S.Ct. at 1132. In that suit, "[u]nder the Sherman Act and the Wilson Tariff Act, the District Court ha[d] no jurisdiction ... to enter a money judgment. Its only power [was] to restrain the future continuance of actions or conduct intended to monopolize or restrain commerce." Id. at 219-220, 65 S.Ct. at 1133-1134. Despite the limited remedies provided for by those statutes, the United States in DeBeers applied for and obtained a freeze on the defendant's assets during the pendency of the lawsuit. See id. at 215-16, 65 S.Ct. at 1132-33. The Supreme Court in DeBeers reversed the issuance of the injunction because it was in no way "ancillary" to a final remedy within the power of the district court. Under the Sherman and Wilson Tariff Acts, the district court was empowered only to enjoin the continued violation of the law: the asset freeze thus was impermissible because it "deal[t] with a matter lying wholly outside the issues in the suit" and "deal[t] with property which in no circumstances can be dealt with in any final injunction that may be entered." Id. at 220, 65 S.Ct. at 1133.
 
 
 23
 The present case is a far cry from the situation in DeBeers. Here, the Lanham Act provides both for the award of a defendant's profits and the imposition of money damages if a violation of that Act is established: the assets frozen by the district court thus were not "matter[s] lying wholly outside the issues in the suit" nor "property which in no circumstances can be dealt with in any final [relief] that may be entered." Id. at 220, 65 S.Ct. at 1134.[11] DeBeers merely held that a district court does not have the equitable power to order the seizure of a defendant's assets when that provisional remedy is in no way related to the district court's power to grant final relief. That holding is undoubtedly persuasive and just, but it is inapplicable here.
 
 
 24
 Dicta in DeBeers may be more expansive than the precise holding in that case. In the penultimate paragraph of DeBeers, the Supreme Court stated the following:
 
 
 25
 To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.
 
 
 26
 Id. at 222-23, 65 S.Ct. at 1135-36. Betech urges us to read that dicta broadly and hold that an equitable freeze of a defendant's assets is impermissible even in actions in which the assets are "related to" the claims raised by the lawsuit and the seizure "ancillary" to the final relief which the district court is authorized to grant. We reject Betech's suggestion. DeBeers itself explicitly noted that "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." Id. at 220, 65 S.Ct. at 1133. The asset freeze issued in Reebok II is such "intermediate relief": it is an equitable provisional remedy designed to secure the availability of Reebok's equitable right to an accounting of Betech's profits. Our precedent makes clear that such a remedy is authorized by the district court's inherent equitable powers. Nothing in DeBeers is to the contrary. Because the injunction issued in Reebok II freezing Betech's assets was a provisional remedy of the same equitable character as the final relief in the form of an accounting of Betech's profits the district court was authorized to award, the court retained the inherent equitable power to issue that provisional relief pending its final award.
 
 D.
 
 27
 Despite the presence of such inherent power to issue provisional remedies ancillary to its authority to provide final equitable relief, Congress may deprive the federal courts of that power by establishing a comprehensive enforcement scheme containing the exclusive remedies for a given statutory violation. See Religious Technology Center v. Wollersheim, 796 F.2d 1076, 1088 (9th Cir.1986), cert. denied, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). However, Congress's intent to adopt such an exclusive regime must be clear: a strong presumption militates against any such finding. As the Supreme Court stated almost a half-century ago:
 
 
 28
 Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.... Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' Brown v. Swann, 10 Pet. 497, 503, 9 L.Ed. 508 (1836).
 
 
 29
 Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 1088, 90 L.Ed. 1332 (1946); see also Los Angeles Trust Deed and Mortgage Exchange v. SEC, 285 F.2d 162, 182 (9th Cir.1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961) ("Congress must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes."). Betech contends that the passage of the Lanham Act deprived the district court of its inherent power to issue equitable remedies in cases arising under that Act.
 
 
 30
 Betech relies primarily on Religious Technology Center v. Wollersheim, 796 F.2d 1076 (9th Cir.1986), cert. denied, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987) to support that contention. Wollersheim held that injunctive relief was not available to a private plaintiff in a civil suit under the Racketeer Influenced and Corrupt Organization ("RICO") Act. See id. at 1077-89. Our ruling in Wollersheim was based upon an extensive review of the language and legislative history of the RICO Act, see id. at 1082-89; based on that review, we concluded that "Congress did not intend to give private RICO plaintiffs any right to injunctive relief." Id. at 1088; see also id. ("For civil RICO, there are strong indicia of congressional intent against any implied injunctive relief remedy. Similarly, there is no indication in the language of section 1964 that civil RICO was not intended, as its plain wording states, to limit private plaintiffs only to damages, costs, and fees. Taken together, the legislative history and statutory language suggest overwhelmingly that no private equitable action should be implied under civil RICO.") (emphases in original). In the present case, however, Betech has not identified, nor have we discovered, any legislative history surrounding the adoption of the Lanham Act to suggest that Congress intended that Act to divest federal courts of their traditional equitable powers in cases arising under that statute. Indeed, the text of the Lanham Act itself strongly suggests that Congress intended to retain such equitable authority. See, e.g., 15 U.S.C. § 1115(a) ("Any registration issued under the [Lanham] Act ... shall be prima facie evidence of the validity of the registered mark ... but shall not preclude another person from proving any legal or equitable defense or defect ... which might have been asserted if such mark had not been registered."); 15 U.S.C. § 1116(a) ("[C]ourts ... shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark...."); 15 U.S.C. § 1117(a) ("When a violation of any right of the registrant of a mark ... shall have been established ... the plaintiff shall be entitled ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."). The present case is far more similar to F.T.C. v. H.N. Singer, 668 F.2d 1107 (9th Cir.1982), than it is to Wollersheim. In Singer, we held that 15 U.S.C. §§ 13, 19 did not deprive the district court of its equitable jurisdiction to freeze a defendant's assets because those provisions "did not limit that traditional equitable power explicitly or by necessary and inescapable inference." Singer, 668 F.2d at 1113. Similarly, the language and history of the Lanham Act are far from sufficiently clear to justify the inference that Congress intended that Act to deprive the judiciary of its traditional equitable powers. The district court's inherent equitable power to freeze defendants' assets in cases in which an accounting is the ultimate relief sought is therefore not limited by the Lanham Act.
 
 E.
 
 31
 Betech's final contention is that even if the district court had the authority to issue the preliminary injunction, it should not have done so because the balance of hardships is not in Reebok's favor. We review the issuance of an asset freeze for an abuse of discretion, see Marcos, 862 F.2d at 1364, and find none here. The district court carefully reviewed the considerations for and against the issuance of the injunction. See Reebok II, 737 F.Supp. at 1524-27. It found, and Betech does not dispute, that "plaintiffs are likely to succeed on the merits in this case; [and] that plaintiffs have suffered immediate and irreparable harm from defendants' counterfeiting activities". Id. at 1524. It also found, and Betech again does not dispute, that Betech "may hide their allegedly ill-gotten funds" if their assets are not frozen. Id. at 1527. Betech's assertion that the district court did not analyze the injunction's impact on the defendants: that assertion is meritless. See id. at 1527 ("The Court recognizes that the freezing of assets could work a hardship on the defendants. However, this order makes provisions for withdrawal of living expenses, and for the payment of expenses related to legitimate business operations. If defendants comply with the order, and submit the necessary proof to the Court, no undue hardship need be felt by defendants as a result of this order."). Moreover, "[t]he district court remains free to modify or dissolve the preliminary injunction if warranted by developments in this case subsequent to the noticing of this appeal." Marcos, 862 F.2d at 1364. Based upon the arguments presented by Betech, we cannot conclude that the freeze on its assets constituted an abuse of the district court's discretion.[12]
 
 
 32
 Accordingly, the decision of the district court is
 
 
 33
 AFFIRMED.
 
 FERNANDEZ, Circuit Judge, concurring:
 
 34
 I concur in Judge Reinhardt's fine opinion. I write separately to express only one reservation and to underscore one limitation.
 
 
 35
 My reservation is simply that I do not read the authorities regarding freeze orders quite as expansively as Judge Reinhardt does. Lanham Act cases, like this one, are very similar to traditional tort cases sounding in unfair competition. I think that the Supreme Court's concern about the use of freeze orders was very well taken. The expression of that concern appears in the quotation from De Beers, which is set forth in Judge Reinhardt's opinion. The danger that people will start seeking what amount to attachment orders in simple tort cases is substantial. Nevertheless, it is true that we have made it clear that freeze orders are proper where some form of equitable relief is sought. See Republic of the Philippines v. Marcos, 862 F.2d 1355, 1361 (9th Cir.1988) (en banc), cert. denied, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). An accounting is a form of equitable relief and an accounting is proper in this kind of case. That, however, leads to the limitation that I wish to underscore.
 
 
 36
 In Marcos we allowed a freeze of "certain assets" in order to preserve them because those assets were, arguably, subject to the imposition of a constructive trust. 862 F.2d at 1364.
 
 
 37
 Here there is no pretense of freezing particular assets which are subject to some sort of constructive trust. This is a prejudgment freeze of everything the appellants own--it is sweeping, general, and very broad. It is the kind of order that could drive an opponent to the wall regardless of the ultimate merits of the action. It is a frightening example of the reach of the court's injunctive power, and that in a case where an attachment would not lie and an insubstantial bond was required. At least in FTC v. World Wide Factors, Ltd., 882 F.2d 344, 346 (9th Cir.1989), the owner of the fraudulent enterprise had already been found guilty of fraud and had already agreed to pay restitution of over $1 million. The freezing of the assets of his corporation at the behest of the Federal Trade Commission was not very shocking. And in SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1088, 1105-06 (2d Cir.1972), the case had already been adjudicated after a five-day trial and the temporary freeze, which troubled the court, was designed to preserve assets which were to be paid to a trustee for defrauded consumers. Neither of those cases is like the case at hand.
 
 
 38
 However, as Judge Reinhardt points out, the appellants have not properly raised any appellate issue regarding the scope of the freeze order. They have only attacked the district court's power to ever issue such an injunction in a Lanham Act case. Thus, all we need to hold is that in this kind of case a district court can in some instances issue a freeze of some assets for some period of time. That, as I see it, is all we do hold. That alone is fatal to the appellants' case because of the form in which they have chosen to present it to us.
 
 
 
 *
 The Honorable Fern M. Smith, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 It appears that the district court found jurisdiction because appellants' activities in the United States "were the controlling force behind their Mexican distribution of counterfeit REEBOK footwear," and found jurisdiction under the Timberlane test as an alternate basis. See Reebok I, 737 F.Supp. at 1518. We do not decide whether the first part of the district court's analysis would be sufficient in itself because we find that, in any event, it had jurisdiction under the traditional Timberlane test
 
 
 [2]
 In Ocean Garden, we quoted with approval the district court's statement in Reebok I that "[s]ince to this Court's knowledge there has been no adjudication on the merits in the Mexican courts, there is no danger at this time of this preliminary injunction interfering with the laws of a foreign nation." Ocean Garden, 953 F.2d at 504. Demonstration of a present and direct conflict between the laws of two nations, however, is unnecessary: it is a sufficiently cognizable interest under the Timberlane test for there to exist the possibility of a conflict between the law or policy of the United States and the law or policy of another nation. Of course, the degree of the risk of conflict is highly relevant to the weight of that factor in the Timberlane balance: the greater the possibility of conflict, the less the exercise of extraterritorial jurisdiction is justified, and vice-a-versa
 
 
 [3]
 Reebok's position is supported by Betech's statement that Nathan Betech was incarcerated for approximately one year in Mexico while the Mexican charges were pending
 
 
 [4]
 Reebok and Betech have filed cross-motions to strike various portions of the others' briefs and excerpts of record. Reebok objects to the inclusion of a translation of the judgment of the Mexican court that was rendered after the district court's decision, and Betech objects to the inclusion of various records regarding trademark actions against Betech in Mexico, Korea, and elsewhere. Our decision would be the same with or without the inclusion of the disputed material; accordingly, we decline to rule on the motions to strike
 
 
 [5]
 Betech asserts that its vindication in the Mexican court action--an event which occurred after the notice of appeal was filed in this case--mandates that we vacate the preliminary injunction. It is unclear whether we review only the validity of the preliminary injunction at the time it was imposed or whether the validity of the injunction is affected by events that occurred subsequent to its entry. In general, "[p]apers not filed with the district court or admitted into evidence by that court are not part of the clerk's record and cannot be part of the record on appeal." Kirshner v. Uniden Corp. of America, 842 F.2d 1074, 1077 (9th Cir.1988). "[N]ormally the reviewing court will not supplement the record on appeal with material not considered by the trial court." Daly-Murphy v. Winston, 837 F.2d 348, 351 (9th Cir.1987). However, exceptions to that general rule exist. See, e.g., Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1403 & n. 2 (9th Cir.1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990) (taking judicial notice, under Fed.R.Evid. 201(b)(2), of facts contained in the reports of a public body). On the other hand, changes in law or fact that have occurred after a preliminary injunction has been appealed occasionally have served as the basis for returning the matter to the district court. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 458, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (remanding case so that district court may reconsider its entry of a permanent injunction "in light of th[e] holding [of the Court in Lyng ], and in the light of any other relevant events that may have intervened since the injunction issued"); Tepos-Perez v. INS, 449 F.2d 1290, 1291 (9th Cir.1971) (remanding appeal of temporary injunction to district court to consider possible intervening events, but failing to specify what those events might be or citing authority for its decision to remand)
 We need not decide whether we can properly consider the decision of the Mexican court in determining the question of extraterritorial jurisdiction, however, because our consideration of that judgment would not affect that determination: at best, any resulting conflict between the law and policy of Mexico and the law and policy of the United States is outweighed by the large number of Timberlane factors that support exercise of territorial jurisdiction in the present case. See pages 555-557. Of course, Betech remains free to request that the district court dissolve or modify either of the injunctions issued against it based upon the result of the Mexican proceedings or any other relevant events that have occurred subsequent to the filing of the notice of appeal. See Republic of the Philippines v. Marcos, 862 F.2d 1355, 1364 (9th Cir.1988) (en banc), cert. denied, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989).
 
 
 [6]
 Conatech S.A. did not appear in the district court and does not appeal the issuance of the injunction
 
 
 [7]
 Betech also alleges that the action should have been dismissed on forum non conveniens grounds. There is no indication that Betech raised this issue below or preserved it for appeal. In any event, "the plaintiff's choice of forum should not be disturbed 'unless the balance is strongly in favor of the defendant," Cheng v. Boeing Co., 708 F.2d 1406, 1410 (9th Cir.), cert. denied sub. nom, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983) (quoting Gulf Oil v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)), and "[t]he forum non conveniens determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 237, 102 S.Ct. 252, 256, 70 L.Ed.2d 419 (1981). Betech could make no such showing here
 
 
 [8]
 Betech raises only the jurisdictional objection, rejected above, to the preliminary injunction entered in Reebok I, which prohibited it from continuing its allegedly illegal business activities; accordingly, we uphold that injunction
 
 
 [9]
 See 15 U.S.C. § 1117(a) (providing, inter alia, that "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action")
 
 
 [10]
 Rule 64 provides one source of possible authority for an asset freeze, but the Rule does not exclude (either by its terms or by necessary implication) all alternate sources. Moreover, even if state law incorporated by Rule 64 provided the sole authorization for prejudgment attachment of a defendant's assets, it would not necessarily preclude a prejudgment freeze on the transfer of those assets. "While a freeze of assets has the effect of an attachment, it is not an attachment." Marcos, 862 F.2d at 1361. Thus, even if Rule 64 does not itself authorize the injunction issued in Reebok II, it does not preclude its issuance either
 
 
 [11]
 It is unclear whether certain particular assets frozen by the district court are assets that might properly be awarded to Reebok as final relief. The Lanham Act provides for an equitable accounting of the defendant's profits, see supra at 559, and assets that represent those accumulated profits therefore may properly be frozen by the district court as "ancillary" to its final authority to give those profits to Reebok. However, a freeze of those assets that "in no circumstances can be dealt with in any final [relief] that may be entered," DeBeers at 220, 65 S.Ct. at 1133, may not be within the equitable power of the district court. Here, we do not decide the validity of each of the terms of the Reebok II injunction or the authority of the district court to freeze each of the assets the transfer of which is limited by the injunction because Betech has not raised that issue on appeal. See Singer, 668 F.2d at 1113. We hold only that in this case the district court had the authority to enter an asset freeze and that it did not abuse its discretion in doing so
 
 
 [12]
 We deny Reebok's motion for sanctions on appeal