OCEAN GARDEN, INC., Plaintiff-
counterdefendant-Appellee,

v.

MARKTRADE COMPANY, INC.;
Alberto J. Soler, Defendants-
counterclaimants-Appellants.

No. 91–55218.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 1991.

Decided Dec. 31, 1991.

Harlan P. Huebner and Edouard V. Rosa, Huebner & Rosa, Los Angeles, Cal., R. Joseph Trojan, on brief, for defendants-counterclaimants-appellants.

Jeffrey M. Shohet, Anthony M. Stiegler, and Jeanne M. Malitz, Gary, Cary, Ames & Frye, San Diego, Cal., for plaintiff-counter-defendant-appellee.

Before SNEED, BEEZER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Ocean Garden Products ("OGP") was awarded a preliminary injunction preventing Marktrade, Inc. and Alberto Soler (collectively, "Marktrade") from imitating, copying, or making unauthorized use of OGP's trademarks or trade dress. Marktrade appeals the preliminary injunction. We affirm.

## I

OGP markets canned fish and seafood products including Mexican abalone under the "Calmex" brand name. Marktrade markets similar products under the brand names "Sardimex" and "Seamex," and distributes "Rey Del Mar" canned abalone for export to the Far East. Marktrade uses trade dress similar to OGP's "Wheel Brand" abalone.

On May 14, 1990, OGP filed a complaint for federal and common law trademark infringement, unfair competition, unfair business practice, dilution, injunctive relief, interference with prospective economic advantage, interference with contract, unjust enrichment, and declaratory relief. On November 14, 1990, OGP filed a motion for a preliminary injunction which was granted in part on December 17, 1990. The preliminary injunction enjoined Marktrade from "imitating, copying or making any unauthorized use" of OGP's trademarks including (1) "Calmex"; (2) "Wheel Brand Ship's Wheel superimposed over a map of Baja California"; (3) "Wheel Brand Ship's Wheel superimposed over Chinese characters"; and (4) "any use of the Ship's Wheel in combination with the use of the color pink, as the background label color along with the color blue as an accent color at the top or bottom of 'Rey Del Mar' abalone cans."

On January 27, 1991, Marktrade appealed the preliminary injunction.

## II

A district court's decision to grant a motion for a preliminary injunction will be upheld unless the court "applied incorrect law, relied on clearly erroneous factual findings, or otherwise abused its discretion." *NEC Electronics v. Calif. Circuit Abco*, 810 F.2d 1506, 1508 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). As the Seventh Circuit has noted in language particularly appropriate to this case, "[t]o be clearly erroneous, a decision must ... strike us as wrong with the force of a five-week old, unrefrigerated dead fish." *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir.1988). The question of whether the court has subject matter jurisdiction is a question of law and is to be reviewed de novo. *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir.1985) (citing *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)).

## III

Marktrade argues that the district court lacked jurisdiction because the canned abalone OGP complains of "is exclusively harvested, processed, and canned in Mexico by the Cooperatives, which is a Mexican association of Mexican abalone fisherman." This abalone is sold exclusively in the Far East. OGP contends there is jurisdiction on two grounds. First, OGP alleges that Marktrade's trademark and trade dress infringement affects United States foreign commerce. Marktrade orchestrates and manages its business from the United States and both OGP and Marktrade are California corporations. Secondly, it claims there is jurisdiction because the goods pass through a United States foreign trade zone in Los Angeles.

In the instant case, we find both extraterritorial jurisdiction, and jurisdiction resulting from shipment through a United States foreign trade zone.

## A

The purpose of the Lanham Act is to "regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce ... to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks." 15 U.S.C. § 1127 (1988). In the instant case, OGP registered its trademark with the U.S. Patent and Trademark Office and was thus protected from infringement under the Lanham Act.

■ In interpreting the jurisdictional scope of the Lanham Act, the Supreme Court has stated that the Lanham Act provides a "broad jurisdictional grant" that extends to "all commerce which may lawfully be regulated by Congress." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283, 286, 73 S.Ct. 252, 254, 255, 97 L.Ed. 319 (1952). "Various circuits have recognized the Supreme Court's view of the 'sweeping jurisdictional language' of the Lanham Act." *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 737 F.Supp. 1515, 1518 (S.D.Cal. 1989) (citations omitted). Moreover, "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." *Bulova*, 344 U.S. at 286, 73 S.Ct. at 255 (citation omitted).

■ "[T]he Lanham Act's coverage of foreign activities may be analyzed under the test for extraterritorial application of the federal anti-trust laws set forth in *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n.*, 549 F.2d 597 (9th Cir.1976) (*Timberlane I*)." *Star–Kist*, 769 F.2d at 1395. Under *Timberlane I*, there are three criteria that must be considered: (1) there must be some effect on American foreign commerce; (2) the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; (3) the interest of and links to American foreign commerce must be sufficiently strong in relation to those of other nations. *Star–Kist*, 769 F.2d at 1395.

■ With respect to the first criterion, OGP argues that it is losing millions of dollars in revenues through trademark infringement. We find that "the sales of infringing goods in a foreign country may have a sufficient effect on commerce to invoke Lanham Act jurisdiction." *Van Doren Rubber Co. v. Marnatech Enterprises, Inc.*, 1989 WL 223017 *4 1989 U.S. LEXIS 17323 *11, 13 U.S.P.Q.2d (BNA) 1587 (S.D.Cal.1989) (quoting *American Rice, Inc. v. Arkansas Rice Growers Cooperative Ass'n*, 701 F.2d 408, 415–16 (5th Cir.1983)). OGP also alleges a threat by Marktrade to infringe in the United States. However, there is no ground for this allegation.

■ As for the second criterion, OGP claims that Marktrade dilutes OGP's trademark in the United States. This is not at all clear from the facts of this case. The injury would seem to be limited to the deception of consumers in the Far East. However, both OGP and Marktrade are U.S. corporations, and there is monetary injury in the United States to OGP, which is cognizable under the Lanham Act. 15 U.S.C. §§ 1116, 1117 (1988).

■ OGP's claim is also very strong with respect to the third criterion. The third *Timberlane* factor is divided into seven components—these weigh heavily in granting extraterritorial jurisdiction in this case. *See Star–Kist* 769 F.2d at 1395. (1) *Degree of conflict with foreign law:* In the case before us, there are no pending proceedings in Hong Kong or Taiwan. Therefore this case is distinguishable from *Star–Kist*, where there was an ongoing petition pending in the Philippine patent office. As in *American Rice:*

Absent a determination by the [foreign] court that [the defendant] has a legal right to use the marks, and that those marks do not infringe [the plaintiff's] mark, we are unable to conclude that it would be an affront to [the foreign country's] sovereignty or law if we affirm the district court's injunction prohibiting the

defendant from injuring the plaintiff's [foreign] commerce conducted from the United States.

*American Rice,* 701 F.2d at 415–16; *see also Reebok* 737 F.Supp. at 1520 ("[s]ince to this Court's knowledge there has been no adjudication on the merits in the Mexican courts, there is no danger at this time of this preliminary injunction interfering with the laws of a foreign nation"). (2) *Nationality of the parties:* Marktrade and OGP are both California corporations. (3) *Extent to which enforcement is expected to achieve compliance:* The injunction would be effective against Marktrade because it is a U.S. corporation which "orchestrated [its] infringing activities," *Reebok,* 737 F.Supp. at 1520, from the United States. Marktrade, in response, argues that the Mexican cooperative could continue infringement activities on its own. However, the facts in the record indicate extensive involvement by Soler and Marktrade in these activities. (4) *Relative significance of effects on U.S. as compared to elsewhere:* Here OGP is also a United States corporation, and therefore the losses involved affect a domestic corporation. (5) *Explicit purpose is to harm U.S. commerce:* There is evidence that Marktrade's infringing acts were intentional. *See* discussion *infra* pp. 507–508. Therefore, Marktrade's actions may be said to have the explicit purpose of harming a U.S. corporation. (6) *Foreseeability of such effect:* Because the above five factors weigh in OGP's favor, such effect was foreseeable. (7) *Relative importance of violations within the U.S.:* Again, OGP is a U.S. corporation and is hurt by the infringement. Moreover, the goods were exported through a United States foreign trade zone, *see* discussion *infra* part III.B., and therefore the violation may be said to have importance in U.S. commerce.

We find that we can exercise extraterritorial jurisdiction in this case. As in one lower court case, "[e]ven though no [counterfeit items] entered the United States, the defendants ... were residents of California, [were] subject to the state's jurisdiction[,] and orchestrated their ... counterfeiting activities from California." *Van*

*Doren Rubber,* 1989 WL 223017 at * 4, 1989 U.S. LEXIS 17323 at *10.

### B

■ We also find that the court has jurisdiction without having to exercise extraterritorial jurisdiction because the infringing goods passed through a United States foreign trade zone. Foreign trade zones are areas within the United States where Congress "established Government-supervised bonded warehouses where imports are stored duty free for prescribed periods." *Xerox Corp. v. County of Harris,* 459 U.S. 145, 150, 103 S.Ct. 523, 526, 74 L.Ed.2d 323 (1982). Goods that are in these zones may be stored, sold, exhibited, broken-up, repacked, assembled, distributed, sorted, and mixed with foreign or domestic merchandise without being subject to customs laws. 19 U.S.C. § 81c (1988); *A.T. Cross Co. v. Sunil Trading Corp.,* 467 F.Supp. 47, 48 (S.D.N.Y.1979). Through these zones, "United States citizens could be involved in and, consequently financially profit from the breaking down, repacking and relabeling of the goods." *A.T. Cross,* 467 F.Supp. at 50. "The Act stimulated foreign commerce by allowing goods in transit in foreign commerce to retain in secure storage, duty free, until they resumed their journey in export." *Xerox,* 459 U.S. at 150, 103 S.Ct. at 526.

The scope of subject matter jurisdiction under the Lanham Act is quite broad. It makes actionable the deceptive use in "commerce which may be lawfully regulated by Congress," marks that are protected by having been registered in the United States Patent and Trademark Office. 15 U.S.C. § 1127. The jurisdictional question this presents is whether Congress has the power to regulate commerce within United States foreign trade zones, or whether it has precluded the reach of the Lanham Act into such zones by withdrawing from them Congress' relevant regulatory powers.

■ We hold that instead of withdrawing its power to regulate commerce in these zones, it is apparent that Congress has retained that authority, and delegated

its use to a board consisting of the Secretary of Commerce, the Secretary of the Treasury, and the Secretary of the Army. 19 U.S.C. § 81a. Section 81c of the same act states that "[F]oreign and domestic merchandise of every description, *except such as is prohibited by law,* may, without being subject to the customs law of the United States ... be brought into [such zones]." 19 U.S.C. § 81c (emphasis added).

A careful analysis of the Code of Federal Regulations on foreign trade zones and trademarks demonstrates why we find infringing goods in these zones are *not* precluded from the customs law. The Code distinguishes between prohibited and conditionally admissible merchandise. 19 C.F.R. § 146.31 (1991). The regulations state that "[d]istrict directors shall not admit prohibited merchandise," *id.,* which is defined as "merchandise the importation of which is prohibited by law on grounds of public policy or morals, or any merchandise which is excluded from a zone by order of the Board. Books urging treason or insurrection against the U.S., obscene pictures, and lottery tickets are examples of prohibited merchandise." 19 C.F.R. § 146.1(b)(13). Customs regulations state that "[a]rticles of foreign or domestic manufacture bearing a mark or name copying or simulating a recorded trademark or trade name shall be denied entry and are subject to forfeiture as prohibited importations." 19 C.F.R. § 133.21(a) (1991). It is reasonable to infer that merchandise that infringes trademarks under section 133.21(a) would be another example of prohibited merchandise under section 146.31.

Thus, Congress has and does exercise the power to regulate commerce—including "merchandise that infringes trademarks"—inside foreign trade zones. Given this fact, entry of infringing goods into a foreign trade zone is a sufficient act in commerce to trigger subject matter jurisdiction in federal courts under the Lanham Act, which, by definition, can only be brought to vindicate marks that enjoy protection in the United States by virtue of proper registration.[1]

■ In pronouncing this rule, we agree with *A.T. Cross* which held that "since the Commerce Clause extends into the foreign trade zone, and the jurisdictional reach of the Lanham Act is coextensive therewith ... the jurisdictional parameters of the Lanham Act reach within the foreign trade zone." *A.T. Cross,* 467 F.Supp. at 51. The *A.T. Cross* court emphatically stated—and we agree—that "[t]here is absolutely no indication in the Foreign Trade Zone Act that Congress ever intended to exclude goods therein from regulation under United States laws by the Federal Courts." *Id.*

Our rule does *not* create plenary federal court jurisdiction over every item that touches a foreign trade zone. Take, for example, a Swiss company selling French goods in Hong Kong, with a trademark not protected in the United States. Should it turn out that the French goods are infringing on an English company's mark, the fact that the goods stopped in a United States foreign trade zone would be insufficient to establish jurisdiction in a suit brought in our courts by the English company against the Swiss company. The United States has no interest in such a case.

■ If the above cause of action were based, however, on a mark protected by the Lanham Act, then jurisdiction in our federal courts would attach. Section 44 of the Lanham Act allows a foreign national to

---

1. Marktrade argues that under *Xerox,* 459 U.S. at 150–51, 103 S.Ct. at 526–27, goods in foreign trade zones are not subject to American regulations. However, that case only involved taxation of goods within the zone. The case, in fact, can be used in support of granting jurisdiction. The Supreme Court stated that "[w]hile the goods are in bonded warehouses they are in the joint custody of the United States Customs Service and the warehouse proprietor and under the continuous control and supervision of the local customs officers. Detailed regulations control every aspect of the manner in which the warehouses are to be operated." *Id.* at 150, 103 S.Ct. at 526 (citations omitted). Given the amount of regulation of commerce within the foreign trade zones, federal courts have jurisdiction under the Lanham Act's grant of jurisdiction for cases involving deceptive use of trademarks in "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127.

register a mark even though the mark has never been used in U.S. commerce. 15 U.S.C. § 1126 (1988). It is *necessary,* however, for the foreign registrant to use the mark in U.S. commerce within a reasonable time or it is deemed abandoned. Thomas J. McCarthy, *Trademarks and Unfair Competition,* § 19.23 at 924 (2d ed. 1984). Moreover,

> if such a foreign registrant does not use the registered mark in United States trade within a reasonable time, the registration is subject to cancellation for abandonment. Under the Lanham Act, nonuse for two consecutive years is prima facie evidence of abandonment and is an evidentiary basis for the required use within a "reasonable time" after registration by a foreign resident.

*Id.* at 924 (citing 15 U.S.C. § 1127 ("Abandonment")). Even if there is no abandonment challenge, it is necessary to file a section 8 affidavit—showing that a mark has been used in commerce during the fifth year of U.S. registration—before the end of the sixth year. 15 U.S.C. § 1058(a) (1988). Without filing this affidavit, the U.S. registration is automatically cancelled. Given the requirement of a U.S. use for all registered trademarks, a Lanham Act claim, even involving foreign parties, will involve U.S. interests. If the goods that violate the Lanham Act are also shipped through a U.S. foreign trade zone, that is a sufficient act in commerce for subject matter jurisdiction. Therefore, jurisdiction was proper in the district court in the present case.

## IV

In granting the preliminary injunction, the district court did not abuse its discretion if OGP demonstrated either "(1) a combination of probable success on the merits *and* the possibility of irreparable injury if relief is not granted or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply

**2.** In fact, the Ninth Circuit has announced several tests. There is the six-factor test used in the instant case, a five-factor test, *see Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987), and an eight-factor test, *see AMF*

in its favor." *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir. 1987).

## A

OGP must prove probable success on the claim that there is a likelihood of confusion as to the source or origin of the goods caused by the similarity of the marks. *Eclipse Assoc. Ltd. v. Data General Corp.,* 894 F.2d 1114, 1116 (9th Cir.1990). The district court utilized the Ninth Circuit's six-factor test to determine OGP's likelihood of success on the merits.[2] We will briefly discuss each of the six factors in order to determine if the district court's finding was clearly erroneous or whether the court abused its discretion.

■ (1) *Strength of Trademark:* "A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses." *Sleekcraft,* 599 F.2d at 349. Marktrade argues that the "Wheel Brand" trademark is merely a geometric design that should not be afforded protection. *See Daimler–Benz Akt A.G. v. Ford Motor Co.,* 143 U.S.P.Q. (BNA) 452 (T.T.A.B.1964). However, *Daimler–Benz* is distinguishable. The court there held that Mercedes' three-pointed star is simply dissimilar to Ford's four-pointed star—not that the Mercedes symbol is not copyrightable. Moreover, the trademark in the instant case is not just a geometric design. The wheel superimposed on top of a map of Baja California is very distinctive. The design is not descriptive, but arbitrary. *See Miss World (U.K.) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir.1988). Marktrade contends that the wheel mark *describes* abalone. This unsupported contention has no merit. Finally, OGP has done extensive advertising, and has used the mark for thirty years, which strengthens OGP's mark. *See Century 21 Real Estate Corp.*

*Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979). However, the contents of these tests are interchangeable. *Eclipse,* 894 F.2d at 1117.

*v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir. 1988).

(2) *Similarity in appearance, sound, and meaning:* A comparison between the two labels shows the two labels to be practically identical. The colors are identical, the ship wheels imposed over a map of Baja California are identical. Moreover, given the possibility of intentional infringement, *see* discussion *infra* pp. 507–508, it is not surprising that the two labels are so similar.

(3) *Class of goods in question:* Both products are canned abalone.

(4) *Marketing channels:* The parties agree that the marketing channels are the same for each product.

(5) *Evidence of consumer confusion:* Four declarations submitted by OGP—from agents and brokers of OGP in Taiwan and Hong Kong, as well as from an officer for OGP—indicate that many Asian customers who do not speak English purchase on trademark appearance alone. Moreover, there is evidence in the record that OGP's distributors have been contacted by consumers and buyers to ask if Marktrade's products were associated with OGP.

Marktrade, in response, submitted a declaration from an employee of a Taiwan trading company that deals with Marktrade products. She claims that due to the amount of counterfeit Calmex abalone on the market, and the high retail price of one can, "consumers have developed skills and knowledge to proper [sic] identify the product including the 'can code' of each can they buy at any store." Marktrade also claims that the confusion that OGP discusses is too speculative. However, as OGP persuasively points out, "[t]he defendant's suggestion that consumers inspect each can with a magnifying glass and read its 'can code' before making a purchase strains their credibility. This is akin to suggesting that American consumers read the computer bar code of each product before they make a purchase in the grocery store."

(6) *Marktrade's intent:* This is the most damning element against Marktrade. There is an abundance of evidence that

suggests intentional infringement. Indeed, "intent of a defendant in adopting his trade dress is a critical factor, since if the trade dress were adopted with the intent of depriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity." *First Brands,* 809 F.2d at 1385.

According to John Filose, an officer at OGP, the Rey Del Mar label was very distinguishable from OGP's merchandise until April or May of 1989—about the time Soler and Marktrade became involved with the Mexican Federation of Cooperatives, who are the packagers of the abalone. Moreover, there is some evidence that Marktrade was directly involved in counterfeiting OGP's labels. A representative of OGP discovered counterfeit Calmex labels that were traceable to Marktrade as the exporter of the cans from the United States.

Marktrade disputes this evidence and, in effect, blames the Mexican Federation of Cooperatives. Marktrade also claims that OGP knew of the counterfeiting and failed to do anything about it because it welcomed the greater name recognition.

However, there was other evidence of intentional infringement. In January, 1990, Soler and some associates from the packing plants met with an import/export business in Hong Kong. An officer of that company, H.F. Chu, submitted a declaration where he described a meeting he had with Soler where Soler laid out his plan for taking over the abalone market:

> During the meeting, it was also stated in Mr. Soler's presence that in 1990 they would pack the Rey Del Mar brand in a lithographic tin can which closely resembles the Calmex trade dress can; they would imprint on the top of the Rey Del Mar lithographic tin can OGP's Ship's Wheel trademark logos in red to copy OGP's trademarks; that they would imprint a Ship's Wheel identical to OGP's trademark on the top of the lids, in the same location as OGP's trademark Ship's Wheel in order to exactly copy OGP's

trade dress cans and trademark logos onto the Marktrade Rey Del Mar cans.

The appearance of Marktrade's cans, with trade dress similar to OGP's cans, corroborates the declaration. Clearly, there was substantial evidence for the district court to find the possibility of bad faith.

Assuming that only some of the allegations are true, OGP has established probable success on the merits of this case. Given the above six factors, the balance of hardships tips sharply in OGP's favor and it would have been an abuse of discretion for the district court *not* to grant the preliminary injunction.

Marktrade also argues that OGP cannot succeed on its trade dress infringement claim. OGP would have to show a likelihood of success on the claim that its trade dress is (1) nonfunctional, (2) has acquired a secondary meaning, and (3) is likely to be confused. *First Brands*, 809 F.2d at 1379.

Marktrade first claims that the color pink is not protectable. This argument has no merit. OGP only wants to protect the color in combination with its Ship's Wheel trademark. Marktrade also has not shown that the trade dress in the instant case is functional. "[A] product feature is functional if it is essential to the [product's] use … or if it affects the cost or quality of the article." *Id.* at 1381. Unlike the shape of a bottle, which might be functional, the picture of a wheel is not functional. It does not affect the cost or quality of the abalone inside the can. The entire trade dress, taken as a whole—including color and shape of trademark—in the instant case, is nonfunctional.

Secondary meaning is established through depositions which discuss the association consumers have with the Wheel Brand trademark. Moreover, OGP has a likelihood of success on the claim that the copying of the Calmex trademark was intentional, and this supports an inference of secondary meaning. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("we have held that proof of copying strongly supports an inference of secondary meaning" (citations omitted)).

Likelihood of confusion was discussed above. *See supra* pp. 506–508. On balance, the district court's preliminary injunction, based on trademark or trade dress infringement, was not clearly erroneous.

■ Marktrade argues that laches should have prevented the preliminary injunction. This claim has no merit. While laches may bar injunctive relief, *Clamp Mfg. Co. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 515 (9th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989) (citation omitted), it should not do so in the instant case. Several factors must be weighed to determine when laches bars relief: the strength and value of the trademark rights; OGP's diligence in enforcing its mark; the harm to OGP if relief is denied; whether OGP acted in good faith ignorance of Marktrade's rights; competition between OGP and Marktrade; and the harm suffered by Marktrade because of OGP's delay. *Id.* (citing *E–Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)).

■ As discussed above, OGP's trademark is strong. OGP first learned of Marktrade's plan to produce similar labels after the meeting with Chu in January, 1990. There was no actual infringement until late spring or early summer of 1990 and OGP distributors only started to see the infringing cans on the market in the late summer or early fall of that year. The complaint was first filed on May 10, 1990. Clearly laches does not apply with respect to the filing date.

Marktrade, however, also complains that OGP waited over six months from the filing of its complaint to move for the preliminary injunction. Marktrade is unable to demonstrate that any harm resulted from the delay because much of the delay during this period was due to extensions requested by Marktrade. Moreover, these extensions were granted to allow for settlement negotiations. Laches does not bar relief.

Finally, Marktrade argues that the harm to it would be great, and that a preliminary injunction would "be in clear conflict with the competitive need of the canned seafood industry to have freedom to use the color

'pink.' " This argument has no merit, for the preliminary injunction does not prevent the use of pink on seafood cans. It merely prevents Marktrade from using "a Ship's Wheel in combination with the use of the color pink as a background color."

## B

■ Marktrade claims that the district court failed to make the findings of fact required by Fed.R.Civ.P. 52(a). This argument has no merit. "Rule 52(a) has been amended to revise its penultimate sentence to provide explicitly that the district judge may make the findings of fact and conclusions of law required in nonjury cases orally." Federal Civil Judicial Procedure and Rules 145 (Revised 1991 edition) (Notes of the Advisory Committee on 1983 Amendments). The district court's tentative ruling stated that "[a]pplying the six-factor test articulated by *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988), there seems to be a strong likelihood of consumer confusion between the Rey Del Mar cans and the trademarks and trade dress used in Calmex cans." The district court discussed this tentative ruling at the December 17, 1990 hearing.

Even if we were to find that the court's statements were not sufficient to satisfy Rule 52(a), "[f]ailure to comply with Rule 52(a) does not require reversal unless a full understanding of the question is not possible without the aid of separate findings." *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir.1986). We can affirm the district court as long as "the findings are sufficiently comprehensive and pertinent to the issues to provide a basis for the decision, or if there can be no genuine dispute about omitted findings." *Id.; see also McCune v. F. Alioto Fish Co.*, 597 F.2d 1244, 1252 (9th Cir.1979).

■ The Ninth Circuit has, since 1985, taken a finding of a likelihood of confusion to be a factual finding to be overturned only if clearly erroneous. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir.1985) (en banc) ("[w]e hold that henceforth the clearly erroneous standard should be applied in reviewing a trial court's determination concerning likeli-

hood of confusion"); *see also First Brands*, 809 F.2d at 1384 ("[t]he district court's findings [of likelihood of confusion] are not clearly erroneous"). Given the review of the record, above, on the issue of finding a likelihood of confusion, *see supra* pp. 506–508, the district court's findings were not in error.

## C

Marktrade argues that the preliminary injunction is overbroad. It alleges that the injunction should not include the Calmex trademark. It claims that the wording of the injunction could prevent it from using the "Sardimex" and "Seamex" trademarks. Marktrade's allegation is based on the following: (1) the hearing for the preliminary injunction included no ruling on whether "Sardimex" and "Seamex" were confusingly similar to OGP's "Calmex"; (2) OGP did not raise this allegation as a basis for its motion for preliminary injunction; (3) OGP's admission in its motion to dismiss that "OGP has not alleged that defendants' 'Sardimex' and 'Seamex' trademarks literally infringe on OGP's 'Calmex' trademarks."

OGP's reply is that "[t]he district court did not enjoin defendants from using the 'Seamex' and 'Sardimex' marks and defendants remain free to do so pending the outcome of the trial." OGP's reading of the order is correct. Marktrade is not restrained from using "Sardimex" or "Seamex"—in fact those names are not mentioned at all in the order for preliminary injunction. Marktrade is only restrained in this injunction from using "trade dress confusingly similar to plaintiff's CALMEX 'Wheel Brand' abalone, including without limitation, any use of a Ship's Wheel in combination with the use of the color pink as the background label color along with the color blue as an accent color at the top or bottom of 'Rey Del Mar' abalone cans." There is, therefore, no merit to its argument. Marktrade is not restrained, in this injunction, from using "Sardimex" or "Seamex."

## V

OGP requested attorney's fees claiming that the appeal by Marktrade was frivolous

510

and interposed in bad faith. We would grant this award under Fed.R.App.P. 38 ("If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee"), or Fed.R.App.P. 46(c) ("A court of appeals may ... take any appropriate disciplinary action against any attorney who practices before it").

In the instant case, the issue of jurisdiction in a foreign trade zone had not been decided by the Ninth Circuit. The appeal was, therefore, not frivolous.

## VI

We find that the district court had jurisdiction to order the preliminary injunction. We find both that the court had extraterritorial jurisdiction and that the court had jurisdiction because the goods were shipped through a foreign trade zone. Moreover, the district court's granting of the injunction and finding of a likelihood of confusion between the trademark and trade dress of OGP and Marktrade were not clearly erroneous. Finally, the claim that the preliminary injunction was overbroad is meritless.

AFFIRMED.