GUESS ?, INC., Plaintiff,

v.

**TRES HERMANOS, et al., Defendants.**

No. CV–97–6336–KMW (CWx).

United States District Court,
C.D. California.

Nov. 25, 1997.

Steven E. Shapiro, Robert C. Walsh, Daniel M. Petrocelli, Mitchell Silberberg & Knupp, Los Angeles, CA, for Plaintiff.

Richard J. Codding, Don Francis Livornese, Loeb & Loeb, Los Angeles, CA, Maurice D. Meyers, Maurice D. Meyers Law Offices, Beverly Hills, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WARDLAW, District Judge.

The Court has considered Plaintiff Guess ?, Inc.'s ("Guess") Motion for Preliminary Injunction. Having considered all of the papers filed in support of and in opposition to this motion, the oral argument of counsel, and all evidentiary materials submitted by the parties, the Court is prepared to rule and hereby **GRANTS** Plaintiff's motion for preliminary injunction.

## I. BACKGROUND

### A. Factual Background

Plaintiff has designed, manufactured, and marketed denim jeans and other apparel since 1981. In 1984, Plaintiff registered the term "Guess?" inscribed within an inverted white triangle with a red border in the U.S. Patent and Trademark Office on March 27, 1984, Registration No. 1,271,896. Plaintiff also registered the symbol "?" inscribed within the same red-edged inverted triangle on April 6, 1993, Registration No. 1,762,986. Plaintiff further registered a red-bordered inverted white triangle on the Supplemental Register in the PTO on June 16, 1992, Registration No. 1,695,617 (copies and depictions of all federal trademarks attached to Martinez Decl. at Ex's 1–4).

The inverted triangle logo is used on Plaintiff's jeans, placed at the top-center of the right, rear jeans pocket. Plaintiff's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("MPI") at 6:27–28. Plaintiff's marketing is national and international, MPI at 8:1–3, and the logo itself is widely recognized. MPI at 10:10–28, 11:1–17. The logos used on the jeans and in other promotions are the marks registered on the PTO primary register with the word "Guess?" or a "?" symbol inside the triangle (red lettering on women's jeans, blue or green lettering on men's jeans). The inverted red-edged triangle is not used without lettering or the "?" inscribed inside in advertising or on products.

Defendants operate several retail stores in Los Angeles called Tres Hermanos. Defendants sell jeans under the "Yield" brand name, and use as a label on the jeans an inverted white triangle with red edging with the word "Yield" in red inside. Def's Opp., Ex. 1. The location of the logo is the same as that of the Guess logo, centered on the upper portion of the right rear jeans pocket.

Plaintiff states causes of action for (1) statutory trademark infringement, 15 U.S.C. § 1114; (2) false designation of origin, 15 U.S.C. § 1125(a); (3) dilution of a famous mark, 15 U.S.C. § 1125(c); (4) state unfair competition, Cal. Bus. and Prof.Code § 17200 et seq.; and (5) injury to business reputation and dilution, Cal. Bus. and Prof.Code § 14330.

### B. Procedural Background

Plaintiff discovered Defendants' use of the allegedly infringing logo in 1996. On or about November 22, 1996, Plaintiff advised Defendants by letter of its federal trademarks and its belief that Defendants' logo was infringing, and requested that Defendants cease and desist from continued use of the logo. On August 22, 1997, Plaintiff filed suit for trademark infringement, seeking a preliminary injunction in addition to other relief, and on October 2, 1997, Plaintiff moved for a preliminary injunction.

## II. LEGAL STANDARD

The Supreme Court has repeatedly held that "the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). To obtain a preliminary injunction, the moving party must show "either (1) a combination of probable success on the merits and the possibility of irreparable injury,

or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury." *Dr. Seuss Enterprises, L.P. v. Penguin Books,* 109 F.3d 1394, 1396 n. 2 (9th Cir.1997), citing *Big Country Foods, Inc. v. Board of Educ.,* 868 F.2d 1085, 1088 (9th Cir.1989). In trademark cases, "[o]nce the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir.1993).

## III. ANALYSIS

### A. Likelihood of Success on the Merits: Trademark Claim

■ To obtain a preliminary injunction, the plaintiff must show that it is likely to prevail on the merits. *Wilson v. Watt,* 703 F.2d 395 (9th Cir.1983). The test to determine likelihood of success in trademark infringement claims is the "likelihood of confusion" between the plaintiff's mark and the allegedly infringing mark. *Dr. Seuss Enterprises,* 109 F.3d at 1403; 15 U.S.C. § 1125(a)(1)(A) (defining infringement as a use which is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of the user with the senior user). The Ninth Circuit uses an eight factor test to analyze the likelihood of confusion in all trademark cases. *Dr. Seuss Enterprises,* 109 F.3d at 1404. The factors are as follows: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; (8)

likelihood of expansion of the product lines. *Id.,* citing *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979). The list is not exhaustive and other factors may be considered depending on the particular factual circumstances. *Id.*

### 1. Strength of the Mark.

■ Strength of the mark is demonstrated by "extensive advertising, length of time in business, public recognition and uniqueness." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1179 (9th Cir.1988). Defendants do not dispute the strength of Plaintiff's "Guess?" principle trademark, which includes the word "Guess" and/or the symbol "?". Def's Opp. at 6:22–23.

### 2. Proximity of the Goods

■ Related goods are more likely to cause confusion than unrelated goods, and therefore the Ninth Circuit has held that a diminished standard of similarity is applied when comparing the marks of closely related goods. *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1392 (9th Cir.1993), citing *Sleekcraft,* 599 F.2d at 350. Both parties manufacture and sell "designer" jeans. Defendants assert that their products are different because they are "cut to fit Mexican Americans"[1] and are made in shades of red, brown, and green, in addition to indigo. Def's Opp. at 13. However, these features do not alter the fact that the ultimate products are jeans. As a result, the standard of similarity of the marks is lessened here.

### 3. Similarity of the Marks

This is the critical factor at issue. Defendants contend that their logo is not similar to Plaintiff's logo. Def's Opp. at 11:11–13. Defendants first argue that consumers' recognition of Guess's logo stems from the word and "?" symbol located within the inverted triangle, not from the overall inverted triangle shape, red-edging, and placement of the logo on the product. Def's Opp. at 6:24–26, citing

---

1. In view of the fact that Defendants sought unsuccessfully three times to sell Guess jeans to the market it claims is limited to Mexican Americans, the argument that the Yield jeans cut is more appropriate for that market and thus serves

to minimize confusion rings hollow. Further, Defendants provide no evidence for their stereotypically-based assertion that Mexican Americans require some form of uniquely fitted jeans.

*CBS, Inc. v. Morrow,* 708 F.2d 1579, 1581–82 (Fed.Cir.1983) ("In a composite mark comprising a design and words, the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is attached.") Defendants further argue that their mark looks like a "yield sign" and gives a "very realistic visual impression" of one because of its inverted triangle shape and red border. Def's Opp. at 11:6–10. Defendants also argue that any similarity of their inverted triangle design and red edging is uninfringing on Plaintiff's use of these features because Plaintiff was unable to register the inverted white triangle with red edging on the PTO's principle registry. Def's Opp., Ex. 7. Finally, Defendants contend that use of a simple geometric shape such as a triangle is afforded very little protection, citing a case in which Guess unsuccessfully attempted to preclude another party from using a plain, un-inverted triangle on watches. *Guess? Inc. v. Nationwide Time, Inc.,* 16 U.S.P.Q.2d 1804 (S.D.N.Y.1990).

In this case, Defendants' individual arguments regarding non-similarity of the marks do not accumulate to render their mark distinctive. The determination of "similarity" should not be element by element, but should be based on "the marks and names in their entirety and as they appear in the marketplace". *Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 605–06 (9th Cir. 1987); *see also California Cooler, Inc. v. Loretto Winery Ltd.,* 774 F.2d 1451, 1455 (9th Cir.1985) ("[T]he composite may become a distinguishing mark even though its components individually cannot."). In addition, as stated earlier, a lesser degree of similarity between two parties' marks is required when the marks are applied to identical goods or services. *See Hrl Associates, Inc. v. Weiss Associates, Inc.,* 12 U.S.P.Q.2d 1819, 1989 WL 274391 (TTAB 1989), aff'd, 902 F.2d 1546 (Fed.Cir.1990).

■ Defendants correctly state that ordinary geometric shapes such as triangles are generally afforded little protection when examined alone. In *Nationwide Time,* the court denied Guess from precluding defendant's use of triangles on watches, holding that the triangle shape alone could be protectable only upon proof of secondary meaning. *Id.* at 1805, citing 1 J. McCarthy,

*McCarthy on Trademarks and Unfair Competition* at 7:12 (2d ed.1984) (geometric shapes such as triangles are "regarded as non-distinctive and protectable only upon proof of secondary meaning."). However, notwithstanding the fact that *Nationwide Time* adjudicated use of the same logo that is at issue here, the defendant's logo there was a plain triangle, un-inverted, and used on watches. In this case, Defendants' mark is more similar to the Guess logo in that its triangle is inverted and red-edged with a word inscribed inside, and is used on jeans in the location in which Plaintiff places its logo on jeans. The majority of Plaintiff's sales are of jeans, and since 1983, Plaintiff has consistently used its logo on the right rear pocket. Martinez Decl. ¶ 11. Defendants' logo examined in its entirety, and as it appears in the marketplace, is an inverted red-edged triangle used on jeans in the same manner and location as Plaintiff's logo. The only difference in Defendants' logo is its lack of a "?" symbol, and the word "Yield" for the word "Guess".

Further, Defendants' mark does not, in fact, give a "very realistic visual representation" of a yield sign. In Exhibit 2 to Defendants' Opposition, a photograph of a yield sign reflects that an actual yield sign is white in the middle, with a thick red inner border that takes up at least one-third to one-half of the area inside the triangle, edged by a thin white border. This Court also takes judicial notice of the visual aspect of a yield sign, represented by this photograph and description. Thus, Defendants' mark is not representative of a yield sign because it is comprised entirely of white inside, with a thin red edge; a design that is more evocative of Plaintiff's mark.

This case is akin to *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817 (9th Cir.1980), in which plaintiff Levi Strauss Company attempted to exclude Wrangler's from placing a black "tab" on its back right pocket, similar to Levi's red tab on its back right pocket. There, Levi's had obtained six federal trademark registrations covering its pocket tabs, for red tabs, tabs that carried the name "Levi's", and tabs of varied colors that were sewn vertically to the left-hand vertical seam

of the right rear pocket. *Levi Strauss*, 632 F.2d at 818 n. 1. Defendant Wrangler attempted to use a black inset label with the word "Wrangler" sewn horizontally to the top edge of the right rear pocket. The Ninth Circuit ruled for Levi's, holding: "that a distinctive location and defined shape of a label function as a trademark may be shown by evidence that buyers recognize the location and shape as an indication of origin." *Id.* at 820–21. The court rejected Wrangler's argument that Levi's could not preclude it from using the tab on pants when the alleged trademark was "not limited to any size, color, or precise location of label, or to any wording on the label," and held instead that the pocket tab trademark "gives the public a reliable indication of source and thus facilitates responsible marketplace competition." *Id.* at 821 n. 5.

Here, it is undisputed that Guess's Plaintiff's "Guess?" mark is strong and associated with Guess' products. Based on the *Levi's* case, it appears that the different word inside the triangle is not sufficiently distinct to render Defendants' labels non-infringing. The lack of the "?" symbol is somewhat more problematic, because it is a distinctive part of the mark, and its absence renders Defendants' label less similar to Plaintiff's. However, taken as a whole, the same size, shape, color, and location of the label, and the strength of consumers' affiliation with Plaintiff's label as used on jeans, suggest that Defendants' label is sufficiently similar as to be likely infringing. Upon trial or motion for summary judgment, Plaintiff should make a stronger evidentiary showing of secondary meaning associated with the use of the label on jeans, but based on the preliminary evidence, it appears likely that it can do so.

The PTO's failure to register a trademark is entitled to "some consideration" by this Court, *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1174 (C.D.Cal.1986), but is not binding. On August 30, 1991, the PTO denied registry of Plaintiff's inverted red-edged triangle upon finding it to be a "background design or a carrier for Applicant's word mark; nothing more. As such, it is merely ornamental." *Id.* The PTO further stated that the evidence:

> fails to establish that consumers perceive the triangle, itself, as anything more than a border or a background design for Applicant's word mark and question mark design. The evidence of record fails to show that the triangle, itself, has become an indicatory source or origin in the minds of consumers. [Guess] must submit evidence showing that the triangular border has been promoted apart from the GUESS? portion, and in turn is regarded by consumers as an indicator of source.

The PTO's denial of registration of the red-edged triangle permits others to use red-edged inverted triangles as logos. However, it is less clear whether that denial of registration permits another to use the same shape mark in the same location on a similar product without infringing. Under *Levi Strauss* and *California Cooler* as discussed *supra*, that answer appears to be no. It is also unclear whether six years after the denial, Plaintiff might be able to provide evidence that the triangular logo alone is regarded by consumers as an indicator of source. When taken as a whole, the inverted triangle label on Defendants' jeans is sufficiently similar that it is likely to cause confusion.

### 4. Evidence of Actual Confusion

Defendants claim that Plaintiff has failed to show that consumers have actually been confused. Def's Opp. at 14:17–18. Defendants further state that a survey they commissioned revealed that only four out of 50 individuals surveyed, or 8%, associated the Yield jeans with Guess. Def's Opp. at 14:28–15:1. A closer examination of Defendants' own survey, however, reveals that more consumers associated the Yield jeans with Guess than with Yield. Of 50 individuals questioned, only ten responded that they thought they knew what company made the jeans with the Yield logo. Of those ten, four (40%) selected "Guess" based on the "logo/symbol/triangle", two (20%) selected "Guess" based on "colors/pocket/denim", one (10%) selected "Gap" based on the "label", one (10%) selected "Levi's" because the jeans "look like Levi's", and only two (20%) stated "Yield" because the "tag/label says Yield." Cogan Decl., Ex. C at 9. This suggests that twice as many consumers thought that the jeans were made by Guess than by Yield based on comparing the triangular logos, and

that three times as many consumers overall thought that the jeans were made by Guess than by Yield. It also undermines Defendants' assertion that the word inside the logo is the strongest indicator to consumers of source. Though the survey is probably not statistically sound, to the extent that it bears on brand association and secondary meaning, it shows that more consumers were actually confused as to the source of the product bearing Yield's logo than were not confused. At a minimum it demonstrates that simply inserting a different word in the logo and omitting the "?" symbol does not sufficiently identify the product with a different source, in view of the other factors, such as size, shape, and location, present here.

### 5. Marketing Channels Used

Plaintiff markets to consumers nationally and internationally, whereas Defendants market to local consumers, primarily in the Hispanic community.[2] Def's Opp. at 15:10–12. Defendants state that they direct their advertising exclusively to the Hispanic market in Los Angeles, placing advertisements in Spanish or English and Spanish. *Id.* at 15:16–20. These channels are different. *See Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 572 (6th Cir.1987) (different marketing channels established when defendant is a "small local business with few outlets and a far less sophisticated advertising program."). This factor weighs toward the Defendants.

### 6. Type of Goods and Degree of Care Likely to be Exercised by the Purchaser

■ Both Plaintiff and Defendants market jeans. Plaintiff asserts that apparel products are often purchased on impulse and thus consumers are not likely to exercise a high degree of care in selecting the product. Pl's MPI at 18:15–17. Defendants argue that purchasers of designer jeans are sophisticated jeans buyers and would not be confused. Def's Opp. at 16:7, citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d

867 (2d Cir.1986) ("The district court found, and the parties do not dispute, that the typical buyer of 'designer' jeans is sophisticated with respect to jeans buying."). However, *Lois Sportswear* went on to find that the jeans market overlaps in different segments (i.e. designer and "cut-rate"), and the fact that defendants are in a different market segment makes consumer confusion *more* likely. *Lois Sportswear,* 799 F.2d at 874. The court found that a consumer viewing jeans with similar but not identical logo features in a "cut-rate" clothing store would be more likely to confuse the source of jeans because the consumer might think that the name-designer had decided to enter that market segment using a subsidiary corporation, or do so without a full commitment to that market segment, and purchase the infringing jeans motivated by this mistaken notion. *Id.* at 874. This Court finds that argument persuasive, particularly in view of the common practice of many "designer" brands such as Georgio Armani, Escada, and Liz Claiborne of maintaining "bridge" lines such as Imporio Armani, Laurel, and Liz Sport, which consumers understand originate from the same source but are lesser priced.

### 7. Defendant's Intent in Selecting the Mark

The Ninth Circuit has held that when an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public. *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir.1993). Defendants claim that Mr. Awada, who developed the Yield logo, had no intent to infringe on Plaintiff's logo, but instead was inspired to develop the Yield logo upon observing a yield sign while driving, and "unexpectedly had an inspiration that this would be a nice logo for the new clothing line ." Def's Opp. at 17:5–10, citing Awada Decl. at ¶ 4. While the Yield mark is not wholly dissimilar to an actual yield sign, this justification appears a bit flimsy, particularly when the "Guess?" inverted triangle as used

---

**2.** Defendants do not identify this market with any particularity, i.e. whether they are referring to Mexican Americans, Latin Americans, South Americans, Central Americans, Cubans, etc., which all constitute different market segments, and further do not identify any precise geographical location of this community within Los Angeles other than "East" and "South Central" Los Angeles. Defs' Opp. at 15:12.

on jeans is widely recognized in the jeans industry as an indicator of source.

In addition, Plaintiff provides evidence that Defendants attempted to become an authorized Guess retailer, and submitted three applications in 1996 to that end, which were ultimately rejected by Plaintiff. Mock Decl. ¶ 5–7. These applications provide direct evidence that Defendants were aware of the shape and usage of Plaintiff's mark. In addition, on all three applications, Defendants omitted any mention of their "Yield" brand. From these applications it can be inferred that Defendants were aware of the Guess mark, and that their Yield mark was similar and potentially infringing. The Court thus finds that intent weighs in favor of Plaintiff.

### 8. Likelihood of Expansion of the Product Lines

A finding that either party may expand his business to compete with the other favors a finding of infringement. *Official Airline Guides*, 6 F.3d at 1394. In this case, Plaintiff and Defendants are currently in the same business in the same geographical area, so this factor takes on little importance.

In sum, Plaintiff has a strong likelihood of success on the merits on their trademark infringement claim due to the similarity between the two logos, particularly when viewed in their entirety and as used on the products. This determination weighs heavily in favor of granting Plaintiff's preliminary injunction.

### B. Likelihood of Success on the Merits: Trademark Dilution Claim

Plaintiff also raises a claim trademark dilution based on 15 U.S.C. § 1125(c) (West Supp.1997) and Cal. Bus.Code. § 14330.[3] The federal dilution act provides in relevant part: "The owner of a famous mark shall be entitled ... to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after

the mark has become famous and causes dilution of the distinctive quality of the mark." Defendants do not dispute that Plaintiff's principal registrations which include the word "Guess" and/or "?" symbol qualify as famous marks, and are subject to protection against dilution.

Dilution is defined by statute as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. In analyzing dilution, the foremost goal is "prevent[ing] deception of the public," and preserving the value of the trademark in serving as a "unique symbol to consumers of the source of goods". *Panavision Int'l, L.P. v. Toeppen*, 945 F.Supp. 1296, 1302 & 1304 (C.D.Cal.1996). Traditionally, state dilution statutes have been concerned with conduct that dilutes a trademark by tarnishing the mark or blurring its distinctiveness. *Id.* at 1304; *see, e.g., WAWA Dairy Farms v. Haaf*, 1996 WL 460083 (E.D.Pa.1996), *aff'd*, 116 F.3d 471 (3d Cir.1997) ("HAHA 24 HR Market" dilutes "WaWa" for convenience stores); *Hasbro, Inc. v. Internet Entertainment Group, Ltd.*, 1996 WL 84853 (W.D.Wash. 1996). Tarnishment occurs when a famous mark is linked to products of poor quality or is portrayed in an unwholesome manner. *Panavision*, 945 F.Supp. at 1304; *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 507 (2d Cir.1996).

Here, Plaintiff argues that its mark will be tarnished by Defendants' allegedly infringing conduct because Defendants' jeans are of poorer quality than Plaintiff's jeans, and that the source confusion will tarnish Plaintiff's reputation. Pl's MPI at 23:23–25. Defendants state that their jeans are different from Guess jeans, made according to a different cut and a noticeably different fabric than used in Guess jeans, Def's Opp. at 13, but

---

**3.** Enacted in 1995, the Federal Trademark Dilution Act provides a cause of action for trademark dilution that was previously left to state law. This district court has noted that the precise scope of "dilution" within the federal act has not yet been established, but that the federal act is substantially similar to the California dilution

statute. *Panavision Int'l, L.P. v. Toeppen*, 945 F.Supp. 1296, 1301 n. 1 & 1304 (C.D.Cal.1996). For the purpose of this Order, the analysis under Plaintiff's third cause of action (federal dilution) and fifth cause of action (state dilution) will be the same. *See id.* at 1301 n. 1.

argue that the factors that Plaintiff alleges indicate poor quality (insufficient laundering of material, stiffness of denim, broken stitching, inconsistent thread weight, and excess material in pocket-area) are not significant characteristics for their consumers. Def's Opp. at 21:1–10. Ultimately, the quality of the jeans is a question of fact that cannot be determined from the information provided in the moving papers. However, because the ultimate goal of dilution is to preserve the logo as an indicator of source, it can be presumed from the analysis of trademark infringement that source confusion is likely. Further, a tarnishment/quality claim may be proven on the merits upon sufficient testimony and/or presentation of physical evidence.

## C. Likelihood of Success on the Merits: Unfair Competition Claim

▮ Plaintiff also states a cause of action for unfair competition pursuant to the Lanham Act § 43(a). To succeed on this claim, Plaintiff must show that its trade dress is (1) nonfunctional; (2) either inherently distinctive or has acquired secondary meaning; and (3) is likely to be confused with Defendants' trade dress by members of the consuming public. *International Jensen v. Metrosound, U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993).

▮ Trade dress is a larger category than trademark, representing "the totality of elements in which a product or service is packaged or presented ... the whole visual image presented to customers". McCarthy on Trademarks, ¶ 8:1. "Trade dress protection is more broadly construed, focusing not merely on one facet of plaintiff's product image, but the total image or overall impression of plaintiff's product". *Id.* A defendant may not separate out elements of plaintiff's product to argue that no single element is protectable. *August Storck K.G. v. Nabisco*, 59 F.3d 616, 620 (7th Cir.1995) ("Doubtless the overall appearance is what matters. Dissecting a product or package into components can cause a court to miss an overall similarity") (citations omitted). Unfair competition exists if the "total impression of the package, size, shape, color, design and name upon the consumer will lead him to confuse the origin of the product." *Id.*, citing *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201

F.Supp. 861 (S.D.N.Y.1962), *aff'd*, 312 F.2d 125 (2d Cir.1963).

▮ The three factors comprising the unfair competition claim all favor the Plaintiff (two of which have been addressed in the discussion of trademark, and are not different in the context of trade dress). The logos are non-functional, as the shape and placement of a label serves no function in jeans other than brand affiliation. Defendants do not dispute that Plaintiff's "Guess?" trademark is a strong mark and affiliated with source. Likelihood of confusion has been fully discussed, and is even stronger when the entire, overall impression of the labels as used on the product is considered as opposed to piecemeal interpretation of the red-edged inverted triangle alone. Plaintiff's likelihood of success on a claim of unfair competition based on trade dress infringement is high, and weighs toward granting Plaintiff's preliminary injunction.

## D. Significant Risk Of Irreparable Harm

In trademark cases, "[o]nce the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir.1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that plaintiff will suffer irreparable harm if injunctive relief is not granted.").

The harm that Plaintiff will incur is confusion as to source and loss of the mark as an indicator of quality. *See* McCarthy on Trademarks at ¶ 3:10. In addition, Plaintiff lacks the ability to control the quality of articles manufactured by Defendant and which are attributed to it as the trademark owner. *Id.*, citing *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697 (1st Cir. 1987) ("[f]ew harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it").

■ Defendants argue that the presumption of irreparable injury is inoperative when plaintiff has delayed "either in bringing suit or moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 968 (2d Cir.1995). In *Tough Traveler,* the court held that delay may preclude the granting of preliminary injunctive relief because the failure to act sooner undercuts the "sense of urgency that ordinarily accompanies a motion for preliminary relief." *Id.* While this may be true, it does not take into account Plaintiff's act in sending Defendant a "cease and desist" letter upon discovery of Defendants' potentially infringing use. *See* McCarthy on Trademarks at ¶ 31:15 ("The trademark owner should be allowed a reasonable time to make an out-of-court protest and give the potential defendant time to respond so that the matter might be settled without the need for litigation."); citing *Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500 (9th Cir.1991) (settlement negotiations excuse six-month delay from filing complaint to moving for preliminary injunction). Plaintiff discovered Defendants' product at some time in 1996, and requested Defendants to cease use of its triangular label on November 22, 1996. Plaintiff stated at oral argument that the delay in filing suit and for preliminary injunction was due to negotiations between the parties regarding Defendants' revision of their mark. A letter on file shows that Defendants' counsel advised Plaintiff's counsel in March 1997 that it intended to resolve the problems between their respective clients. Juang Decl. ¶ 3. Apparently, the issues were not resolved by negotiations, Plaintiff ultimately filed suit on August 22, 1997, and moved for preliminary injunction on October 2, 1997. The nine month delay from the cease-and-desist letter to the filing of suit is a reasonable time for Plaintiff to have allowed Defendants to respond to its request and pursue settlement avenues.

■ The further delay of approximately forty-one days between filing of suit and moving for preliminary injunction is more troublesome to the Court, since Plaintiff could have sought preliminary relief on the same day as filing the complaint or at least at an earlier time. However, the cases that Defendants cite to prevent preliminary injunctive relief on the basis of undue delay contain time delays exceeding the forty-one days here. *See, e.g., Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 969 (2d Cir.1995) (plaintiff delayed four months from filing suit before moving for preliminary injunction); *Citibank N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985) (delay of ten weeks after receiving actual notice of infringement before filing suit and several weeks further before moving for preliminary injunction where plaintiff had not sought settlement or any other relief before filing suit); *Delmatoff, Gerow, Morris, Langhans, Inc. v. Children's Hospital Nat. Med. Center,* 12 U.S.P.Q.2d 1136 (D.D.C.1989) (delay of one year before filing for preliminary injunction). Plaintiff's delay of forty-one days is not too long to deny injunctive relief. Given the strength of Plaintiff's claim, and the likelihood of injury, it seems that denial on this ground alone would be excessively rigorous.

In this case, confusion of source is likely as discussed previously, and inability to control Defendants' product is inherent. Plaintiff is entitled to the presumption of harm because they are likely to succeed on the merits.

For the reasons stated herein, Plaintiff's motion for preliminary injunction is **GRANTED.** Plaintiff is ordered to submit a proposed form of order consistent with this memorandum by 12:00 noon on November 26, 1997.

**IT IS SO ORDERED.**